UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK EVENSON, as Trustee of the A.E. Evenson Family Living Trust and the Barbara G. Evenson Family Living Trust, | ) ) ) ) No. 14 cv 4880 |
| Plaintiff, | ) ) Magistrate Judge Susan E. Cox ) |
| v. | ) ) |
| MICHAEL EVENSON, *et al.*, | ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

For the reasons discussed below, the Court denies Plaintiff's Motion to Reopen & Request for Injunctive Relief Pursuant to the All Writs Act [70].

**BACKGROUND**

**I.  The Illinois Proceedings**

Plaintiff is the trustee of trusts established for his aged father and deceased mother (the "Trusts"). Plaintiff filed the instant suit alleging his brother, Michael Evenson ("Mike"), and certain entities controlled by Mike (collectively "Defendants") had received $1.2 million in funds from the Trusts through a fraudulent scheme. (Dkt. 1 at ¶ 1.) Mike is a builder and developer in the Houston area, and Plaintiff alleges that Mike fraudulently induced his aging and increasingly infirm father (who was then the trustee of the Trusts) to loan money to Defendants that was never paid back to the Trusts. (Dkt. 1.) Plaintiff brought causes of action for breach of contract, breach of fiduciary duty, and fraudulent concealment. (*Id.*) In the prayer for relief at the end of the complaint, Plaintiff sought a judgment "in an amount to be established in evidence, in excess of $1,236,450, plus accrued interest, and an award of punitive damages in an amount to be determined by the jury, plus attorneys fees and other costs of collection pursuant to the terms of the Promissory Notes and as otherwise allowed by

1

law, plus costs." (*Id.*)

Shortly after the complaint was filed, the parties agreed to proceed with a settlement conference before this Court. (Dkt. 26, 27.) A settlement conference was held on December 12, 2014; the parties were able to reach a settlement in principle and consented to this Court's jurisdiction. (Dkt. 34.) The parties were able to finalize the agreement on December 31, 2014 (the "Settlement Agreement"), but Plaintiff struggled to secure Defendants' compliance with the Settlement Agreement almost immediately. For purposes of the instant motion, the main problem revolved around Section 8 of the Settlement Agreement (the "Lien Provision"), which stated:

> Michael Evenson Parties shall, to the extent reasonably possible and as soon as practicable, provide and facilitate securing and perfection of security interests in his/their properties, both real and personal, to secure the debt obligation evidenced by this Agreement. Michael Evenson Parties, and any other entity under Michael Evenson's control, shall not permit any other lien or security interest which would have priority over the lien of Evenson Trusts, except for liens for either a construction loan or lot purchase specifically for the property being developed, to exist or be entered against any real property which it owns or controls, without the consent of the Evenson Trusts.

(Dkt. 41, Ex. A at ¶ 8.)

In order to ensure compliance with the Lien Provision, Plaintiff drafted and submitted a Deed of Trust and Security Agreement ("DOTSA") that outlined eight tracts of land in which Plaintiff expected to receive a security interest; in the instant matter, only Tracts 6-7 (the "Polk-Taft Properties") and Tract 8 (the "2804 University Property") are relevant. (Dkt. 70-2.) Plaintiff struggled to get Defendants to sign the DOTSA, and filed a motion to enforce the Settlement Agreement seeking, *inter alia*, an order "compelling Defendants to cooperate in securing and perfecting liens pursuant to the Settlement Agreement by requiring Michael Evenson to sign a Deed of Trust substantially in the form of the attached" to the motion to enforce. (Dkt. 41 at ¶ 17.) Mike failed to appear for the hearing on the motion to enforce, and the Court granted that motion as to the aforementioned relief relating to the DOTSA. (Dkt. 44.)

2

At a hearing several weeks later, on February 23, 2015, the issue of the DOTSA came up again. At that point, Defendants had still failed to execute the DOTSA, and there was some question as to whether Mike had the authority to do so on behalf of the corporate defendants. There were two layers at that time. The first was whether the primary lienholders (*i.e.*, the banks that had financed the purchase of the properties) on the properties that were subject to the DOTSA would assent to having additional liens placed on the properties. The second issue was whether other members of the LLCs controlled by Mike (*i.e.*, investors in Mike's development business) would assent to having additional liens placed on the properties, and whether Mike had the authority to put liens on the property without the investors' consent. As to the first issue, counsel for Defendants assured the Court that the banks would allow the liens to be placed on the properties. On the second issue, Defendants also represented through counsel that Mike had the authority to enter into the DOTSA on behalf of the corporate entities. (Dkt. 70-3 at 11:21-25.) However, none of the individual investors was represented in the instant matter, which left open the possibility that one of them might later challenge Mike's authority to enter into the DOTSA. It was determined that five of the ten properties were solely owned by Mike and would not pose a problem; for the remaining five properties, the parties and the Court agreed to resolve any disputes between other members of the LLCs and Plaintiff at a later date. (*See* Dkt. 70-3 at 8:5-15, 17:7-12, 19:1-20:2). As the Court said, should any of Mike's co-investors later pose a challenge to the amount of money they should receive from a closing on any of Mike's properties, "we just have to cross that bridge when we get to it." (Dkt. 70-3 at 19:24-20:1.) As such, the Court ordered Mike to execute the DOTSA, and he did so approximately two weeks later. (Dkt. 70-2; 70-3 at 19:14.)

Plaintiff filed a second motion to enforce the Settlement Agreement on March 13, 2015. (Dkt. 48.) The Court granted the motion in part and denied it in part, ruling that the parties should confer on a payment installment schedule for the $1 million settlement amount and a dismissal

3

procedure following the final payment. (Dkt. 54.) The parties complied with the Court's order, but Mike missed the second installment. (Dkt. 56, 57.) The Settlement Agreement included a Default Judgment provision which stated that "[i]n the event Michael Evenson Parties fail to make any scheduled payment when due . . . judgment shall be immediately entered in favor of Evenson Trusts and against Michael Evenson Parties in the sum of $1,298,596.93 less amounts received, and such judgment shall be immediately available for execution in any manner permitted by law." (Dkt. 70-1 at ¶ 6.) Pursuant to that agreement, Plaintiff filed a motion for default judgment, which was granted, and the Court entered a final judgment against Defendants in the amount of $1,131,369.83 on January 7, 2016. (Dkt. 57, 63, 64.)

## II.     The Texas Proceedings

After this Court entered judgment against Defendants, Plaintiff domesticated the judgment in Texas. However, Defendants' investors, led by a man named George Lee, sought to have the liens in the DOTSA released as to the Polk-Taft Properties and the 2804 University Property. In March 2016, Lee acquired the lender's first lien on the 2804 University Property by assignment of the debt. (Dkt. 70-8.) On April 12, 2016, the Trust sent notices of intent to foreclose on the secured properties by non-judicial foreclosure. (Dkt. 70-12.) Two weeks later, George Lee, 2804 West U LLC, Polk Taft 14 LLC,[1] Agama Properties LLC, and Apex Limited Trust (the "Lee Parties") sued Mike, the Trusts, and Plaintiff (in his individual capacity) in Texas state court ("the Texas Action"). (Dkt. 70-16.) The Lee parties are challenging the validity of the liens and Mike's authority to attach them to the properties in the Texas Action. (*Id.*) The Lee Parties then obtained a temporary restraining order preventing Plaintiff from conducting the foreclosure sales. On May 3, 2016, Lee foreclosed on the 2804 University Property, and was the highest bidder on the property at $1.9 million. (Dkt. 70-20.). The first lien, which Lee held, had a little over $1.2 million remaining, but Lee did not pay any of the

---

[1] 2804 West U LLC and Polk Taft 14 LLC are both signatories to the DOTSA.

difference between the sale amount and the lien amount to the Trusts. (Dkt. 70-15.)

The Trust and the Plaintiff then stipulated to remove the DOTSA liens on the Polk-Taft Properties in exchange for the Lee Parties depositing $500,000 in the Texas state court's registry, and also agreed to release the *lis pendens* on the 2804 University Property in exchange for an additional deposit of $344,378.36 into the registry. (Dkt. 70-13.) The funds were deposited in the registry and will be released by the Texas state court, pending adjudication of the parties' lawsuit regarding the validity of the liens in the DOTSA. (Dkt. 70-17.) Mike has submitted an affidavit in the Texas Action stating that he did not have authorization to agree to the liens in the DOTSA on behalf of the various corporate entities, and only did so under duress, which is a direct contradiction from the statements he made to the Court at the February 23, 2015 hearing. (Dkt. 70-19.)

On February 7, 2020, Plaintiff filed the instant motion, requesting that the Court: 1) temporarily restrain the Texas Action by entering an order staying the Texas Action in its entirety and enjoin the Texas State Court from "any and all pre-trial activities or holding trial until further ordered;"[2] 2) enter a permanent injunction against Mike, the Lee Parties, and the Texas State Court from "relitigating" or adjudicating the validity of the liens in the DOTSA; and 3) enter an order to show cause against Mike for disobeying a court order. (Dkt. 70 at 28-29.) The motion is now fully briefed and ripe for disposition. For the reasons discussed below, the Court denies the motion.

## DISCUSSION

### I.   The All Writs Act and Anti-Injunction Act

The All Writs Act ("AWA") provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The statute allows district courts to enjoin parallel litigation in both federal and state courts

---

[2] A trial in the Texas Action was originally scheduled to go forward in March 2020, but was postponed due to the COVID-19 pandemic.

under certain circumstances. *In re Jimmy John's Overtime Litigation*, 877 F.3d 756, 762 (7th Cir. 2017). The AWA is an extraordinary remedy that is to be used "sparingly and only in the most critical and exigent circumstances." *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers))).

Beyond those warnings, a federal district court invoking the AWA must also ensure any injunction it issues satisfies the requirements of the Anti-Injunction Act ("AIA"). *See In re Jimmy John's*, 877 F.3d at 763 (quoting *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015)). In its entirety the AIA states: "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Plaintiff does not argue that the first exception applies (*i.e.*, as expressly authorized by Act of Congress); instead the Plaintiff's arguments are that it is proper for this Court to issue an injunction in aid of its jurisdiction and/or to protect or effectuate its judgments. The Court finds that neither of these exceptions applies in this case, and that the injunction sought by Plaintiff is banned by the AIA.

**A.     In Aid of Jurisdiction**

The "aid of jurisdiction" exception only applies to parallel state *in rem* actions rather than *in personam* actions.[3] *Winkler v. Eli Lilly Co.*, 101 F.3d 1196, 1202 (1996) (citing *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 641–42, 97 S.Ct. 2881, 2892–93, 53 L.Ed.2d 1009 (1977)). The instant law suit is clearly an *in personam* action; Plaintiff brought causes of action sounding in tort and breach of contract seeking only money damages to be made whole. As such, there are not parallel *in rem* actions because the suit filed before this Court is not an *in rem* matter.

---

[3] There are certain limited exceptions to this rule such as school desegregation and multi-district litigation that do not apply to this matter. *See Winkler*, 101 F.3d at 1202.

The Court rejects Plaintiff's argument that it "assumed *in rem* jurisdiction over the properties when it ordered that Mike 'is prohibited from doing anything with respect to any and all of his properties in contravention of the Settlement Agreement.'" (Dkt. 70 at 13 (quoting Dkt. 46).) Plaintiff is quoting a minute order that this Court issued on February 17, 2015. (Dkt. 46.) A careful reading of the transcript from the hearing that generated that minute order that Plaintiff quoted above reveals quite the contrary. (*See* Dkt. 65 at 13:14-14:1.) The portion of the Settlement Agreement the minute order contemplated was the requirement that Mike give the Trusts seven days' notice "of any closing with an explanation of proposed use of proceeds including closing statement." (Dkt. 70-1 at ¶ 9.) The Court's order sought to reiterate that section of the Settlement Agreement because Mike had allegedly sold at least one property without providing the requisite notice. The Court's ruling did not concern the liens at all, and did not assume any jurisdiction over any properties; it only sought to enforce the notice requirement in the Settlement Agreement.

Moreover, at the hearing on February 17, 2015, the Court was very clear that its role was limited to enforcing the Settlement Agreement and nothing more, stating "I have limited power here. My power is to enforce the Settlement Agreement, okay? That's really the extent to which I can be involved here." (Dkt. 65 at 9:15-18.) In other words, the Court was not exercising control over the properties at all. The only matter over which the Court could exercise its jurisdiction was whether Defendants had complied with their requirements under the Settlement Agreement, which is essentially a breach of contract claim. If they failed to do so, there was a mechanism by which the Court would enter a default judgment against Defendants for money damages. However, at no time did the Court have the power to dictate the manner in which Defendants managed their properties or enjoin them from transferring or selling any of their properties.[4]

---

[4] The closest the Court came was ordering that Defendants could not sell any properties without the Plaintiff's consent. (Dkt. 44.) However, the Court still did not exercise *in rem* jurisdiction over the properties at that time either. A violative sale of a property could not have been voided by the Court order, nor would the Court have been empowered to rescind

7

The same is true for the liens themselves. The Court has not assumed any jurisdiction over the enforcement or validity of the liens. If Mike had failed to execute the DOTSA or had argued before this Court that he was not authorized to encumber the relevant properties, the Court's available remedies would have been limited to determining whether that failure was a violation of the Settlement Agreement (*i.e.*, whether it was "reasonably possible" to secure and perfect security interests in his property). The Court could then either find that Mike had breached the Settlement Agreement – thereby triggering the Default Judgment Provision – or that Mike had complied with his obligations as far as "reasonably possible." Crucially, the Court could not compel Mike to place the liens on the properties if he did not wish to do so, or had argued he was unable to do so. Had he taken either of those positions, the only mechanism available to the Court was a finding that Mike had breached the Settlement Agreement, and entering a judgment for him in the amount contemplated in the Default Judgment Provision.

However, the issue of Mike's ability to sign the DOTSA was never litigated before this Court. Instead, Mike – through counsel – represented he had authority to sign the DOTSA. At that point, he had stated it was "reasonably possible" to place the liens on the DOTSA properties, and the Court ordered him to sign the DOTSA because it was required under Paragraph 8 of the Settlement Agreement. While it is a fine distinction, it is an important one. The Court was only ordering Mike to comply with the requirements of the Settlement Agreement as drafted by the parties; the Court was doing nothing more than enforcing an agreement between the parties. The Court was not ordering Mike to encumber the properties over his objection; he had agreed to do so already without any Court intervention and the Court was effectuating that agreement, which Mike's counsel stated in open court Mike had the authority to do.

---

any such real property sale. However, it would allow the Court to find that Defendants had failed to comply with their obligations under the Settlement Agreement and enter a default judgment for money damages.

In short, the Court did not exercise *in rem* jurisdiction or control over the properties or the liens at any time during the settlement process, despite Plaintiff's assertion that it did. At all times, the Court's jurisdiction was limited to enforcing the Settlement Agreement through the default judgment mechanism spelled out in that agreement. Therefore, the "aid of jurisdiction" exception to the AIA does not apply because the instant suit is strictly an *in personam* matter.

### B. To Protect or Effectuate a Judgment

The third exception to the AIA – "to protect or effectuate" judgments – is known as the "re-litigation exception," and it "allows a party with a favorable federal judgment to protect that judgment by enjoining repetitive state court proceedings instead of relying on a claim or issue preclusion defense." *Ramsden v. AgriBank, FCB*, 214 F.3d 865, 868 (7th Cir. 2000). The Supreme Court has explained that this exception should be used sparingly:

> [The relitigation] exception is designed to implement well-recognized concepts of claim and issue preclusion. The provision authorizes an injunction to prevent state litigation of a claim or issue that previously was presented to and decided by the federal court. But in applying this exception, we have taken special care to keep it strict and narrow. After all, a court does not usually get to dictate to other courts the preclusion consequences of its own judgment. Deciding whether and how prior litigation has preclusive effect is usually the bailiwick of the *second* court. . . . So issuing an injunction under the relitigation exception is resorting to heavy artillery. For that reason, every benefit of the doubt goes toward the state court, an injunction can issue only if preclusion is clear beyond peradventure.

*Smith v. Bayer*, 564 U.S. 299, 306-07 (2011) (internal quotations and citations omitted).

In diversity cases such as this, federal common law governs preclusion questions; "federal common law borrows the preclusion principles of the laws of the state in which the federal court that dismissed the diversity suit sat." *CFE Group, LLC v. Firstmerit Bank, N.A.*, 809 F.3d 346, 351 (7th Cir. 2015). As such, Illinois law applies in this case. *See id*. In Illinois, the elements for collateral estoppel (*i.e.*, issue preclusion) are: 1) the issue sought to be precluded is the same as the prior action; 2) the issue was actually litigated; 3) the determination of the issue was essential to the final judgment;

9

and 4) the party against whom the preclusion is sought was fully represented in the prior action. *Creation Supply, Inc. v. Selective Ins. Co. of the Southeast*, 2017 WL 661587, at *2 (N.D. Ill. Feb. 17, 2017) (citing *Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 (7th Cir. 1995)).

The issue being presented in the Texas Action – whether Mike had the authority under the LLC Agreements to place the liens on the Polk-Taft Properties and the 2804 University Property – was never actually litigated before this Court. A review of the transcripts in this matter demonstrates that the Court expressly left the issue open for future litigation if any of the Mike's co-investors or lenders came forward to challenge the validity of the liens. Stating that we will "just cross that bridge when we get to it" is not the hallmark of an issue the parties actually litigated and the Court definitively decided. (*See* Dkt 70-3 at 19:24-20:1.) The issue was never litigated because Mike claimed he had the authority, and no party that might challenge that assertion (*i.e.*, individual co-investors in the LLCs) was represented in the instant matter. At the very least, it is not "clear beyond peradventure" that the issue was decided, and the Court does not believe it would be appropriate to resort to "heavy artillery" when the Texas courts are fully capable of deciding issue preclusion in the Texas Action. *See Smith*, 564 U.S. at 306-07. The re-litigation exception does not apply in this case, and the Court will not issue an injunction on this basis.

**II.    Contempt Proceedings**

The Court denies Plaintiff's motion without prejudice to the extent it requests the Court to enter an order against Mike for rule to show cause why he should not be held in contempt of Court. The Court assumes that any contempt proceedings against Mike would need to be criminal contempt, not civil. Civil contempt is "coercive" in nature, whereas criminal contempt is "punitive" in nature; Plaintiff is not asking the Court to coerce Mike into any particular course of action and appears to be asking the Court to punish him for disobeying a court order. *See United States v. Lippitt*, 180 F.3d

873, 876-77 (7th Cir. 1999) (discussing the distinction between criminal and civil contempt). "'The essential elements of a finding of criminal contempt under 18 U.S.C. § 401(3) are a lawful and reasonably specific order of the court and a willful violation of that order.'" *United States v. Trudeau*, 812 F.3d 578, 587-88 (7th Cir 2016) (quoting *Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1297 (7th Cir.1995)).

Plaintiff has not pointed any order of this Court Mike has violated. The order that forms the basis of this motion is the order compelling Mike to execute the DOTSA, and Plaintiff does not argue that Mike failed to do so. Clearly, he complied with that order because the DOTSA forms the basis of the security interests Plaintiff is trying to protect. As such, Plaintiff has failed to demonstrate Mike's actions meet the necessary elements for criminal contempt, and the Court denies the motion on that basis.

To the extent Plaintiff is asking the Court to enter a rule to show cause order against Mike for misrepresenting (through counsel) his authority to enter into the DOTSA, the Court rejects that argument as well.[5] At this point, there is no evidence in front of the Court that Mike made misrepresentations to this Court. Although it is true that Mike has made conflicting factual statements before this Court and in the Texas Action regarding his authority to execute the DOTSA, the Court cannot say which statement is true and which is false. As discussed above, the issue of Mike's authority to sign the DOTSA on behalf of his corporate entities was never litigated before this Court because it was never challenged at any point by any party. That issue is best left to the Texas state court, which will have the full panoply of evidence available to it in making its decision, including Mike's representations to this Court through counsel both orally and in writing that he had authority to enter into the DOTSA. The Texas state court can probe the veracity of Mike's various diametrically

---

[5] Moreover, such a motion would likely be more appropriately brought under FRCP 11(b) than as a criminal contempt proceeding.

opposed and self-serving statements and determine which is true.

The Texas state court's decision will then determine whether Mike was telling the truth before this Court when he said he was able to enter the DOTSA. If the Texas state court rules in favor of the Plaintiff and finds that Mike had authority to enter into the DOTSA and the liens are valid, then Mike did not make misrepresentations before the Court, and a contempt proceeding would be wholly inappropriate (at least before this Court). If the Texas state court rules in favor of the Lee Parties and invalidates the liens based on Mike's affidavit, a contempt proceeding against Mike for making misrepresentations to the Court might be appropriate, but Plaintiff should be aware of the potentially pyrrhic nature of such a victory. If the Court found that Mike lied about his authority to enter into the DOTSA, the Court would be loath to let stand its order compelling him to execute the DOTSA, which was enforced because of Mike's representations that he had the authority to do so; in other words, that order was premised on the very misrepresentations that Plaintiff seeks the Court to punish through contempt proceedings. The possible cascade effect of a finding that Mike misrepresented his ability to enter into the DOTSA might be antithetical to Plaintiff's interests – the DOTSA begat the Settlement Agreement; the Settlement Agreement begat the installment payment plan; the installment payment plan begat the default judgment proceedings; the default judgment proceedings begat the final judgment in Plaintiff's favor for over $1 million. Regardless, that issue is not properly before this Court now, because there is no indication to this Court that Mike's statements in the instant suit were false and his affidavit in the Texas Action is true, and not vice versa. There is no proof at this point that Mike has done anything but make conflicting factual statements in two different court proceedings, which is not a sound basis for initiating criminal contempt proceedings.

Finally, the Court does not believe it would be appropriate to pursue criminal contempt charges against Mike at this time because it would be an impermissible backdoor assault of the Texas Action. The fundamental question in any future contempt action will be whether Mike lied to the

Court about his authority to enter into the DOTSA. A finding that he lied is equivalent to a finding that he lacked the authority to enter into the DOTSA and that the liens are invalid, which is the precise question before the Texas state court. As discussed above, the Court does not believe it is the appropriate venue for that question and will avoid any action that might affect the fair litigation of that issue in the Texas Action.

For the reasons discussed above, the Court does not believe it should wade into these matters at this time. Nonetheless, the Court recognizes that the outcome of the Texas Action may change the landscape of this matter, and therefore denies the motion without prejudice to the extent it seeks a rule to show cause order or any other sanctions against Mike.

## **CONCLUSION**

For the reasons discussed above, the Court denies Plaintiff's Motion to Reopen & Request for Injunctive Relief Pursuant to the All Writs Act [70].


**ENTERED: June 22, 2020**

_____
Hon. Susan E. Cox,
United States Magistrate Judge