UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK EVENSON, as Trustee of the A.E. Evenson Family Living Trust and the Barbara G. Evenson Family Living Trust, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL EVENSON, *et al.*, <br><br> Defendants. | No. 14 cv 4880 <br><br> Magistrate Judge Susan E. Cox |

**MEMORANDUM OPINION AND ORDER**

For the reasons discussed below, Defendants' Motion Pursuant to Rule 60(b)(5) and for Entry of an Injunction [dkt. 95] is granted in part and denied in part. The Court finds Defendants should have $826,397.89 credited against the judgment entered on January 7, 2016, as detailed below. The remainder of the motion is denied without prejudice. The parties are ordered to file a joint status report within 14 days of this order on the issues raised herein regarding 0 Office Park Drive, 13730 Office Park Drive, and 11030 Saathoff Drive. Finally, Plaintiff is ordered to file documentation demonstrating the disposition of proceeds from the sale of 6617 and 6619 FM 2920 within 14days of this order.

    **I.**    **Background**

Plaintiff Mark Evenson is the trustee of trusts established for his aged father and deceased mother (the "Trusts").[1] Plaintiff filed the instant suit alleging his brother, Michael Evenson ("Mike"), and certain entities controlled by Mike (collectively, "Defendants") had received $1.2 million in funds from the Trusts through a fraudulent scheme. (Dkt. 1 at ¶ 1.) Mike is a builder and developer in the Houston area, and Plaintiff alleges that Mike fraudulently induced his aging and increasingly infirm

---

[1] The Court uses the terms "Plaintiff," the "Trusts," and the "Trust" interchangeably throughout this opinion.

1

father (who was then the trustee of the Trusts) to loan money to Defendants that was never paid back to the Trusts. (Dkt. 1.) Plaintiff brought causes of action for breach of contract, breach of fiduciary duty, and fraudulent concealment. (*Id*.)

Shortly after the complaint was filed, the parties agreed to proceed with a settlement conference before this Court. (Dkts. 26, 27.) A settlement conference was held on December 12, 2014; the parties were able to reach a settlement in principle and consented to this Court's jurisdiction. (Dkt. 34.) The parties were able to finalize the agreement on December 31, 2014 (the "Settlement Agreement"), in which Defendants agreed to pay $1 million to the Trusts by June 30, 2016. (Dkt. 60-1 at ¶ 1.) In exchange for the agreement to pay $1 million to the Trust, Section 11 (the "Release") states in pertinent part:

> Except as to such rights or claims as may be created by or enforced pursuant to this Agreement, [Plaintiff] . . . hereby forever and fully release[s] and discharge[s] [Defendants] . . . from any and all claims, demands or causes of action, including in concert with then, from any and all claims, demands or causes of action, including but not limited to those heretofore arising out of, connected with, incidental to and/or contained in the Action and the facts alleged therein, through [December 31, 2014].

(Dkt. 60-1 at ¶ 11(a).)

Next, Section 8 of the Settlement Agreement (the "Lien Provision") provides:

> Michael Evenson Parties shall, to the extent reasonably possible and as soon as practicable, provide and facilitate securing and perfection of security interests in his/their properties, both real and personal, to secure the debt obligation evidenced by this Agreement. Michael Evenson Parties, and any other entity under Michael Evenson's control, shall not permit any other lien or security interest which would have priority over the lien of Evenson Trusts, except for liens for either a construction loan or lot purchase specifically for the property being developed, to exist or be entered against any real property which it owns or controls, without the consent of the Evenson Trusts.

(Dkt. 41, Ex. A at ¶ 8.)

Finally, The Settlement Agreement included a "Default Judgment" provision which stated

2

that "[i]n the event [Defendants] fail to make any scheduled payment when due . . . judgment shall be immediately entered in favor of Evenson Trusts and against [Defendants] in the sum of $1,298,596.93 less amounts received, and such judgment shall be immediately available for execution in any manner permitted by law." (Dkt. 60-1 at ¶ 6.)

Pursuant to the Lien Provision, Plaintiff drafted and submitted a Deed of Trust and Security Agreement ("DOTSA") that outlined eight tracts of land in which Plaintiff expected to receive a security interest. (Dkt. 97-2.) The parties all understood the purpose of the DOTSA, which expressly states that the liens in the eight properties were granted to the Trusts "for the purpose of securing and enforcing the payment of the debt obligation pursuant to a Settlement Agreement dates December 31, 2014, (hereinafter the 'Settlement Agreement') in the original principle sum of ONE MILLION DOLLARS ($1,000,000) under the payment schedule agreed to between the parties, and with the final amounts due being payable no later than June 30, 2016 . . . ." (Dkt. 97-2 at 2-3.)

Plaintiff filed a motion to enforce the Settlement Agreement on March 13, 2015. (Dkt. 48.) The Court granted the motion in part and denied it in part, ruling that the parties should confer on a payment installment schedule for the $1 million settlement amount and a dismissal procedure following the final payment. (Dkt. 54.) The parties complied with the Court's order, but Mike missed the second installment payment. (Dkt. 56, 57.) As a result of the missed payment, the Court entered a final judgment against Defendants in the amount of $1,131,369.83 on January 7, 2016. (Dkt. 57, 63, 64.)

Before launching into the labyrinthine history of Plaintiff's collection efforts, the Court pauses here to look holistically at the state of play at the time the judgment was entered. This Court presided over the settlement conference and the related motion practice and litigation, and is in a uniquely excellent position to understand the context of the instant motion. The Settlement Agreement represents a compromise between the parties to resolve their disputes. In exchange for their

3

agreement to cease litigation of the underlying claims in the instant suit, Defendants received a "General Release which covers claims and causes of action for any form of damages, whether compensatory, punitive, statutory, or otherwise, and includes claims and causes of action for all forms of costs, fees, or expenses, which accrued or arose as of [December 14, 2014.]" (Dkt. 60-1 at ¶ 11(c).) In exchange for their agreement to stop seeking damages against Defendants, the Trusts received a promise to pay $1 million. (Dkt. 60-1 at ¶ 1.) Given the personal history between the parties and the nature of the allegations, Plaintiff was understandably wary about Defendants' commitment to meeting their obligation to pay the settlement amount over time. To assuage that concern, Plaintiff negotiated a mechanism whereby Defendants would have a judgment entered against them if they missed payments. Moreover, to ensure that that judgment was worth more than the paper it was printed on, and to facilitate collection on the judgment, Plaintiff also insisted on receiving property interests in some of Defendants' properties, which are represented in the liens that make up the DOTSA.

     Crucially, neither the enforceable judgment for over $1 million nor the property interests granted to Plaintiff to satisfy that judgment in the DOTSA would exist without the Settlement Agreement. In other words, *all* the rights Plaintiff sought to enforce after the breach of the Settlement Agreement flow from the Settlement Agreement itself and are part of the consideration Defendants offered in exchange for a general release from any and all claims that existed as of December 14, 2014. The DOTSA was a result of Section 8 of the Settlement Agreement and Plaintiffs would have no secured property rights in any of Defendants' properties but for the Settlement Agreement. Similarly, the Judgment was a product of Section 6 of the Settlement Agreement and would not have been entered but for the Settlement Agreement. The motivating purpose behind both those provisions was to ensure that the Trust could collect the $1 million settlement amount from Defendants and/or any judgment that was entered pursuant to the Default Judgment provision.

Defendants filed the instant motion pursuant to Federal Rule of Civil Procedure 60(b)(5) seeking an order finding they had fully satisfied the judgment. According to Defendants, they had made certain payments, setoffs, and transfers totaling $2,545,258, which outstrips the value of the judgment. (Dkt. 95 at 5-6.) Unfortunately, Defendants' motion was vague on the values of the properties sold or transferred – many of the amounts were estimated or unverified – and contained little in the way of documentation proving that the judgment had been satisfied. For its part, Plaintiff's response to Defendants' motion indicated that the Trusts had chosen to execute some of the liens granted in the DOTSA and use the proceeds acquired against debts other than the judgment. The Court believed these filings "raise[d] more questions than they answer[ed]," and ordered additional briefing on the disposition of the relevant properties and where Plaintiff had chosen to apply the proceeds from any property sales or transfers. That briefing is complete, and the Court is prepared to rule on the instant motion.

**II. Discussion**

The primary legal issue before the Court is whether the DOTSA gives Plaintiff the right to apply funds received pursuant to the liens granted therein to debt obligations other than the judgment in this case. "When interpreting the language of a deed of trust, Texas law dictates that the court be governed by the same rules of construction that apply to contracts."[2] *Craig v. Ponderosa Development, LP*, 392 B.R. 683, 691 (E.D. Tex. 2007). "[T]he court is directed to look exclusively to the language of the deed of trust, unless ambiguous, to determine the intention of the parties at the time of its execution." *Id.* "Additionally, the court must 'examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless.'" *Id.* (quoting *Meisler v. Republic of Tex. Sav. Ass'n*, 758 S.W.2d 878, 883–84 (Tex.App.-Houston 1988.)) However, where a deed of trust is ambiguous, the Court may consider parol evidence "to

---

[2] The DOTSA is construed according to Texas Law. (Dkt. 97-2 at ¶ 17.)

5

remove the ambiguity of the words used in the deed of trust, to show the true intention of the parties." *Amistad, Inc. v. Frates Communities, Inc.*, 611 S.W.2d 121, 127 (Tex. App. 1980).

Plaintiff relies on the so-called "dragnet clause" of the DOTSA to justify the decision to apply funds to debts beyond the judgment. The relevant paragraph starts by stating "[t]he conveyance" of the liens on the eight tracts of land "is made in trust on the following trusts, terms and conditions, and **for the purpose of securing and enforcing the payment of the debt obligation to a Settlement Agreement dated December 31, 2014** . . . in the original principal sum of ONE MILLION DLLARS ($1,000,000) under the payment schedule agreed to between the parties, and with the final amounts due being payable no later than June 30, 2016, executed by" Defendants and the Trust "in lawful money of the United States of America." (Dkt. 97-2 at 3-4 (emphasis added).) Following a semicolon, the "dragnet clause" reads in full:

> all renewals, rearrangements, extensions and/or modifications of the Settlement Agreement, and any and all other indebtedness, obligations and liabilities of any kind of Borrower and/or Grantors to Beneficiary, now or hereafter existing, absolute or contingent, joint and/or several, secured or unsecured, due or not due, arising by operation of law or otherwise, or direct or indirect, including indebtedness, obligations and liabilities to Beneficiary of Borrower and/or Grantors as a member of any partnership, syndicate, association or other group, and whether incurred by Borrower and/or Grantors as principal, surety, endorser, guarantor, accommodation part or otherwise, and whether originally contracted with Beneficiary or acquired by Beneficiary pursuant to a loan participation agreement or otherwise (all of which a re (sic) hereinafter referred to as the 'Indebtedness').

(Dkt. 97-2 at 4.)

Here the Court finds that the DOTSA is ambiguous. One on hand, the DOTSA clearly states the conveyance of the liens in the DOTSA is "for the purpose of securing and enforcing the payment of the debt obligation pursuant to [the] Settlement Agreement." (Dkt. 97-2 at 4.) On the other hand, the "dragnet clause" defines "Indebtedness" in incredibly broad terms well beyond the debt obligation in the Settlement Agreement, and the DOTSA goes on to say that the pledging of the liens are

6

"security for the Indebtedness." (Dkt. 97-2 at ¶ 1.) It is unclear from the plain language of the DOTSA whether the liens were meant to secure the debt obligation in the Settlement Agreement or something broader.[3]

Having determined that the DOTSA is ambiguous on this issue, the Court turns to parol evidence to determine the parties' intent. The best parol evidence in this instance is the Settlement Agreement. Paragraph 8 of the Settlement Agreement obligated Defendants to "provide and facilitate securing and perfection of security interests in his/their properties, both real and personal, to secure the debt obligation evidenced by this Agreement." (Dkt. 60-1 at ¶ 8.) The result of that mandate is the DOTSA. Clearly, the parties' intention was for the DOTSA to secure the debt obligation in the Settlement Agreement and not the broad panoply of potential obligations raised in the "dragnet clause." The Court does not believe it was the parties' intention to allow the DOTSA to become a vehicle for Plaintiff to collect funds for other debts that were unrelated to the Settlement Agreement or the resulting judgment, and does not believe it is proper for the Plaintiff to use the "dragnet clause" to do so.

As noted above, the DOTSA specifically referenced eight properties and granted Plaintiff liens on those properties for the purpose of securing and enforcing the Settlement Agreement. The parties' filings also contain other properties that were not subject to the DOTSA. The Court will now consider each of the relevant properties in turn below.

---

[3] Even if the Court believed the language were unambiguous, it would still have to find a way to harmonize the two obviously conflicting provisions described above. In most cases, "dragnet clauses" are also known as "future advance clauses" and are intended to ensure that any subsequent debt between the parties is also secured by the deed of trust. *See Craig*, 392 B.R. at 690. The only way the Court can figure to harmonize the two competing clauses is to read the "dragnet clause" as attempting to ensure that future indebtedness between the parties would be covered by the DOTSA. In that case, the phrase "any and all other indebtedness, obligations and liabilities of any kind of Borrower and/or Grantors to Beneficiary, now or hereafter existing" could be read as including all other future indebtedness, while the indebtedness existing "now" would be only the Settlement Agreement. In such a case, the "dragnet clause" could not be read as allowing the Trust to use the DOTSA for any obligation that existed at the time of its execution other than the Settlement Agreement. *See F.D.I.C. v. Bodin Concrete Co.*, 869 S.W. 2d 372, 376-377 (Tex. App. 1993).

### A. DOTSA Tract I – 14010 Junction Creek Lane

The parties agree that Plaintiff received $75,000 from the sale of 1401 Junction Creek Lane in January 2016 and that amount was credited toward the judgment. [Dkt 103-1 at 2.]

### B. DOTSA Tract II – 11020 Saathoff Drive

The Trust received $21,064.84 in proceeds from the sale of 11020 Saathoff Drive ("Tract II"), but did not credit that amount against the judgment. At the time the DOTSA was executed, Prosperity Bank had a $364,000 lien related to a promissory note on Tract II that was senior to the lien granted to the Trust in the DOTSA. (Dkt. 97-2 at ¶ 29(b).) The Defendants defaulted on the promissory note with Prosperity Bank, and Prosperity Bank foreclosed on Tract II on November 1, 2016. (Dkt. 103-1 at 3.) Tract II was sold for $495,000 at foreclosure and, after satisfying the debt to Prosperity Bank, the excess $21,064.84 was deposited into the Trust's bank account. (*Id.* at 4.)

Instead of applying those funds to the judgment, "[t]he Trust chose to credit the excess proceeds to the interest that had accrued on a $150,000 note that Mike . . . had given to the Trust in connection with [Tract II] in 2009." (Dkt. 109 at 2.) According to the Trust, this was a valid choice because "Mike left it to Jeff . . . to decide how the excess proceeds should be allocated," and common law principles allow a creditor to decide which of the various debts the payment shall be applied to. (Dkt. 109 at 2.) This argument fails for two reasons. First, the evidence does not indicate that Mike "left it up" to his brother how to apply the proceeds. The email the Trust cites to support this premise shows Mike writing "[the Trustee] can ask if [the excess funds] can go to you or if it has to go to the trust." (Dkt. 103-12.) The email only directs the Trustee to ask where the money should be sent, it does not cede control over the application of the funds.[4]

---

[4] Moreover, the $150,000 promissory note Mike gave the trust related to loans for Tract II formed the basis of the underlying complaint in this suit. (Dkt. 1 at ¶ 25.) It is expressly one of the loans Plaintiff alleged was fraudulent. As such, any claims related to the 2009 promissory note were released as part of the Settlement Agreement, which released Defendants "from any and all claims, demands or causes of action, including in concert with then, from any and all claims, demands or causes of action, including but not limited to those heretofore arising out of, connected with, incidental to and/or contained in the Action and the facts alleged therein." (Dkt. 60-1 at ¶ 11(a).) This is another reason it was improper

8

Second, and more importantly, it belies a fundamental misunderstanding of the nature of the payment. The only reason the Trust was entitled to any money from the sale of Tract II was the junior lien it held. As noted above, that lien (indeed all the liens memorialized in the DOTSA) was expressly granted to the Trust "for the purpose of securing and enforcing the payment of" the amount owed pursuant to the Settlement Agreement. Similarly, the Settlement Agreement envisioned that Defendants would grant liens to the Trust to "secure the debt obligation evidenced by" the Settlement Agreement. (Dkt. 60-1 at ¶ 8.) In the Court's view, the fact that Defendants ultimately defaulted on payments under the Settlement Agreement does not change the nature of the liens, only the form of the debt owed from an agreed amount to a judgment. As envisioned by the Settlement Agreement, the Trust was able to enforce the payment of the debt obligation Defendants owed to the Trust by receiving the proceeds from the sale of Tract II after the senior lienholder was paid. All parties understood that the property interest the Trust held in Tract II was meant to enforce the Settlement Agreement, and by extension, the judgment entered against Defendants pursuant to the Default Judgment provision in the Settlement Agreement. It would be in contravention of the Settlement Agreement and the purpose of the DOTSA to allow the Trusts to apply funds it collected based on the liens they were granted in the DOTSA to an unrelated debt while the judgment remains untouched.

The Trust wants to have its cake and eat it, too. It wants to enforce the liens it received specifically as consideration for the Settlement Agreement to settle debts completely unrelated to the Settlement Agreement or resulting judgment, while at the same time retaining its enforceable judgment for over $1 million. Meanwhile, Defendants are held in state of perpetual debt peonage with a judgment that is never credited. Simply put, any amount recovered by virtue of the liens in the DOTSA should be credited against the judgment. To the extent the Trust wants to collect on other

---

for Defendants to apply funds to that promissory note instead of the judgment. Also, because this loan was released as part of the Settlement Agreement, it was not a debt that existed at the time of execution of the DOTSA and would not have been included in the "dragnet clause," even if the Court accepted Plaintiff's preferred reading of the DOTSA.

9

debts, it can do so directly from the relevant debtors or file additional suits to enforce the rights under those promissory notes and ultimately reduce them to an enforceable judgment. They did not and may not use this litigation or the judgment resulting therefrom as a mechanism to enforce debts that are outside the scope of this suit. The Court finds that the $21,064.84 received from the sale of Tract II should be credited against the judgment in this case.

C. **DOTSA Tract III – 26203 Monarch Meadows Court**

The parties agree that $27,081.64 was received from the sale of 26203 Monarch Meadows Court on September 28, 2015, and that amount was credited against the settlement amount prior the judgment being entered in this case pursuant to the mechanism outlined in the Settlement Agreement. [Dkt 103-1 at 4.] Because this amount was already credited against the settlement amount before the judgment was entered, it cannot be used as a credit against the judgment as well.

D. **DOTSA Tract IV – 8717 and 8719 Highway 6 North**

The parties agree that the senior lienholder on 8717 and 8719 Highway 6 North foreclosed on the property, was the winning bidder at the foreclosure sale, and that no funds were dispersed to the Trust from this sale. [Dkt. 103-1 at 5.] No money should be credited against the judgment for this transaction.

E. **DOTSA Tract V – 6617 and 6619 FM 2920**

At the time the DOTSA was executed, 6617 and 6619 FM 2920 ("Tract V") was subject to a senior lien owned by a bank. (Dkt. 109 at 4.) In 2017, the Trust initiated a foreclosure, and won the foreclosure sale with a $200,000 credit bid. (*Id* at 5.) Of course, that left the senior lien. The Trust explains in its brief:

> Since the Trust lacked the funds to pay down [Defendants'] outstanding debt to the Bank, Evenson Holdings, LLC, was created to facilitate a lending arrangement with the Trust and protect the asset. That first involved the Trust's assignment of its foreclosure bid to Evenson Holdings, which took title to the land and held it for the Trust's benefit. Then, Jeff Evenson, as manager of Evenson Holdings, advanced

10

$568,873.26 to the Trust. The Trust wired those funds to the Bank in full satisfaction of South Wall's outstanding debt.

(Dkt. 109 at 6.) Additionally, Defendants owed $30,025.84 in taxes, which the Trust took on when it took title to Tract V. The Trust also counted $40,000 in unpaid rents against Defendants and argue that amount should have been added to Defendants' indebtedness to the Trust; the Court believes that is proper.[5] Eventually, Tract V was sold to a third party. After accounting for expenses, including $568,873.26 paid to the senior lienholder bank, the $40,000 in unpaid rents, and the $30,025.84 in back taxes, the Trust netted $56,018.05 and applied that to the judgment. The Court believes this was the appropriate course of action and rejects the Trust's argument that "[n]othing under the DOT/SA or Texas law required the Trust to [] apply that money to any new or old Indebtedness, including the judgment amount." (Dkt. 109 at 7-8.) As discussed above, paying off the settlement amount and/or resulting judgment is the *raison d'etre* of the DOTSA, and the Trust was compelled to apply the net proceeds from the sale to the judgment. However, noticeably absent from the Trust's submission and evidence is any record of the June 2017 sale of Tract V to a third party. As such, the Court cannot determine if any other proceeds from the sale were improperly withheld. The Trust is ordered to file documentation regarding the sale and allocation of proceeds for review within 14 days of this opinion so the Court may see if any other additional amounts should be credited to the judgment amount.

    F.  **DOTSA Tract VI-VIII – The Polk-Taft Properties and 2804 W. University Blvd.**

After this Court entered judgment against Defendants, Plaintiff domesticated the judgment in Texas. However, Defendants' investors, led by a man named George Lee, sought to have the liens in the DOTSA released as to the 305 and 307 W. Polk Street ("Tract VI"), 1204 Taft Street and 301 W. Polk Street ("Tract VII" and, with Tract VI, the "Polk-Taft Properties") and the 2804 University

---

[5] At the time of the foreclosure sale, Tract V was occupied by a veterinary clinic under a lease for $8,000 per month. According to the Trust, the veterinary clinic did not pay rent and refused to vacate the premises after the Trust became the owner of Tract V. The DOTSA states that, in the case of a foreclosure sale, Defendants "and all other persons in possession of any part of [the property subject to the DOTSA] shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of said Premises." (Dkt. 97-2 at ¶ 15.)

Boulevard property ("Tract VIII"). In March 2016, Lee acquired the lender's first lien on Tract VIII by assignment of the debt. (Dkt. 70-8.) On April 12, 2016, the Trust sent notices of intent to foreclose on the secured properties by non-judicial foreclosure. (Dkt. 70-12.) Two weeks later, Lee and several entities controlled by Lee sued Mike, the Trusts, and the trustee in Texas state court, challenging the validity of the liens and Mike's authority to attach them to Tracts VI-VIII (Dkt. 70-16.) They successfully obtained a temporary restraining order preventing Plaintiff from conducting the foreclosure sales. On May 3, 2016, Lee foreclosed on Tract VIII and was the highest bidder on the property at $1.9 million. (Dkt. 70-20.). The first lien, which Lee held, had a little over $1.2 million remaining, but Lee did not pay any of the difference between the sale amount and the lien amount to the Trusts. (Dkt. 70-15.)

The Trust and the Plaintiff then stipulated to remove the DOTSA liens on the Polk-Taft Properties in exchange for Lee depositing $500,000 in the Texas state court's registry, and also agreed to release the *lis pendens* on Tract VII in exchange for an additional deposit of $344,378.36 into the registry. (Dkt. 70-13.) The funds were deposited in the registry, pending adjudication of the parties' lawsuit regarding the validity of the liens in the DOTSA. (Dkt. 70-17.) Lee and the Trust ultimately settled their suit, and the Texas State Court entered an order on April 25, 2022, which directed $620,000.00 be paid to the Trust. (Dkt. 104-9.) The Trust did not credit any of that money to the judgment.

According to the Trust, it "considers the money that the Lee Parties paid to settle the Texas Action as nothing more than consideration for the mutual dismissal of their claims, not proceeds from the sale of any properties that Mike can now claim as a credit against any debt." (Dkt. 109 at 9.) This argument completely elides the basis of that suit in the first place, which was challenging the validity of the liens that the Trust asserted on Tracts VI-VIII. The Trust was able to settle the suit with the Lee Parties because it had viable property interests in Tracts VI-VIII, which were properties that

12

Defendants owned and provided liens against as security to the Trust to enforce Defendants' obligations to the Trust under the Settlement Agreement.

Furthermore, the contention that the money released to the Trust as part of the settlement was not from the sale of the properties bends the background facts past their breaking point. Had there not been a lawsuit, the Trust, as the junior lienholder, would have been entitled to recoup proceeds from the sale of Tracts VI-VIII after the senior lienholder were paid. Lee initiated the lawsuit to have the liens ruled invalid and keep those proceeds for himself, but ultimately settled the suit and agreed to disperse $620,000 to the Trust. Although these proceeds took a winding path – Lee, to the Texas State Court registry, to the Trust – they are originally proceeds of the sale of Tracts VI-VIII and ultimately the fruits of the liens Defendants granted the Trust through the DOTSA.

At the risk of repeating itself, the Court reiterates that the liens on Tracts VI-VIII were only granted to the Trust as part of the Settlement Agreement, and that the DOTSA states that the animating purpose behind granting those liens was to enforce payment of the settlement amount. But for the Settlement Agreement and the DOTSA, the Trust would have had no rights to proceeds of the sale of Tracts VI-VIII. The Court finds that the $620,000 that resulted from the Trust enforcing its liens in Tracts VI-VIII must be credited against the judgment.

        **G.    18702 La Paloma Estates Drive**

The record surrounding the property at 18702 La Paloma Estates Drive (the "La Paloma Estates Property") is impossible for the Court to parse. In June 2006, Mike borrowed $93,320.83 from the Trusts and used the La Paloma Estates Property to secure that debt (*i.e.*, the Trust was given a lien on the La Paloma Estates Property). (Dkt. 103-1 at 10.) In 2013, Mike sold the La Paloma Estates Property to a third party; although the sale documents reflect that $90,000 will go to "payoff of first mortgage loan," the Trust claims it never received any money from Mike or his companies. (Dkt. 103-1 at 10; Dkt. 103-44 at 2.) The Court is not sure why a sale from 2013 would be relevant

13

to this suit, which settled in 2014. However, Mike is seeking a $93,321 credit against his judgment related to the La Paloma Estates Property. To support this credit, Mike has submitted a Release of Lien dated May 18, 2018, which shows the Trust releasing the lien on the La Paloma Estates Property for $10 "and other good and valuable consideration." (Dkt. 102-8.) It is unclear why the Trust released this lien, what other consideration it may have received, or why it released this lien approximately five years after the sale of the property. Furthermore, it is unclear that the Trust ever received any money from the sale of the La Paloma Estates Property, or how any payments received on a 2013 sale would impact Settlement Agreement executed on December 31, 2014. On this record, the Court cannot credit Mike with any payments that can be deducted from the judgment, and the Court denies the motion without prejudice on this property.[6]

### H. 14615 Cypress Link Trail

In 2017, Mike agreed to sell his property at 14615 Cypress Link Trail ("Cypress Link Trail"), but the sale could not close due to the judgment lien (related to the judgment in this case) the Trust had put on the property. (Dkt. 103-1 at 12.) The Trust agreed to a partial release of the judgment lien in exchange for, *inter alia*, $54,315.00. The sale of Cypress Link Trail went through, and the Trust deposited $54,315.00 in its bank account, but did not credit any of that sum against the judgment. The Trust justifies its decision to credit the funds to other promissory notes by arguing "[t]he only agreed string attached to the Trust's recovery of this money was that the Trust would grant Mike a partial release of the judgment lien – not the judgment debt – which it did." (Dkt 109 at 8.) This argument is too clever by half. The Trust once again willfully ignores the provenance of the right it

---

[6] The Court reaches the same conclusion regarding the $450,000 in credits Mike seeks related to the property at 16039 Comal Bend. (Dkt. 102 at 2.) Mike submitted a Release of Lien that purports to relate to the aforementioned property, but that release states that it is consideration and partial settlement of a 2016 Texas state court action filed by the Trust against Mike, one of his companies, Alamo Title Company, Cornerstone Mortgage Company, and the 2012 purchaser of the property. (Dkt. 102-9; 102-10.) It appears that any payment received by the Trusts pursuant to the sale of 16039 Comal Bend is part of an unrelated action outside of the Settlement Agreement in this suit. The Court cannot credit Mike's judgment based on that record and denies the motion without prejudice as to this property.

asserted to recover funds, in this case the judgment lien. That lien (like all judgment liens) existed to allow the Trust to recover funds to satisfy its judgment; it was not a mechanism to extract cash from a real estate transaction to use as it sees fit. The money it received from its enforcement of its judgment lien should have been credited against the judgment debt. As such, the Court finds an additional $54,315 should be credited against the judgment.

### I. 11030 Saathoff Drive

On June 2, 2017, one of Mike's companies conveyed the property at 11030 Saathoff Drive to Evenson Holdings for the consideration of a "Partial Release of Judgment Lien." (Dkt. 103-60.) On June 7, 2018, Evenson Holdings paid off a $13,971.87 tax lien. (Dkt. 103-61.) On February 4, 2022, Evenson Holdings granted the Trust a $100,000 lien on the property. As will be discussed more fully below, 11030 Saathoff Drive is one of three properties the Trust now possesses that may be used to reduce the judgment. It seems clear from the document conveying this property that Mike intended for the property to be credited against his judgment. Unfortunately, neither party discusses whether this property should be used to reduce the judgment amount, and, if so, how to value the property. Mike claims that the "Estimated Market Value" of the property is $100,000, which correlates to the amount of the lien granted from Evenson Properties to the Trust. However, the Court is unsure if this is the appropriate way to assess the property's value and it is unclear what the Trust's position is on this issue. The Court suspects that real property that is conveyed to the judgment creditor to satisfy a judgment debt can and should be used to reduce the judgment amount, but neither party has discussed the issue in their briefing and the Court was unable to uncover a satisfactory answer in its own research. The motion is denied without prejudice as to 11030 Saathoff Drive. The parties are ordered to meet and confer in person or by videoconference within seven days of this order. At that meeting, they are ordered to discuss whether they can agree on the following issues: 1) whether the transfer of 11030 Saathoff Drive may be used to reduce the judgment; 2) if so, what is the amount the

15

judgment should be reduced; 3) if the parties cannot agree on an amount to reduce the judgment, they are ordered to discuss whether they can agree to a method of valuation (*e.g.*, fair market value at the time of the transfer, fair market value today, the amount reflected in the lien granted to the Trust, etc.) and who should assess the value (*e.g.,* the Court, a third-party assessor agreed on by the parties, government tax assessor records). The parties must file a joint status report following that meeting that does not exceed five pages within 14 days of this order. The Court will determine next steps after reviewing that filing.

### J. 13730 Office Park Drive (the "Cell Tower Lot")

Similarly, one of Mike's Defendant companies conveyed the Cell Tower Lot to Evenson Holdings as a consideration for a partial release of the Trust's judgment lien. (Dkt. 103-65.) Mike contends that the Cell Tower Lot is worth $17,000 with very little evidence to back up that statement. The Trust is virtually silent on the property, although it appears to still own it. The Court confronts the same problem as discussed directly above when trying to figure out the effect of the Cell Tower Lot on the judgment. As such, the motion is denied without prejudice as to the Cell Tower Lot. The parties are ordered to meet and confer in person or by videoconference within seven days of this order. At that meeting, they are ordered to discuss whether they can agree on the following issues: 1) whether the transfer of Cell Tower Lot may be used to reduce the judgment; 2) if so, what is the amount the judgment should be reduced; 3) if the parties cannot agree on an amount to reduce the judgment, they are ordered to discuss whether they can agree to a method of valuation (*e.g.*, fair market value at the time of the transfer, fair market value today, the amount reflected in the lien granted to the Trust, etc.) and who should assess the value (*e.g.*, the Court, a third-party assessor agreed on by the parties, government tax assessor records). The parties must file a joint status report following that meeting that does not exceed five pages within 14 days of this order. The Court will determine next steps after reviewing that filing.

### K. 0 Office Park Drive

Although the method by which the Trust came to possess the property at 0 Office Park Road is different than the previous two properties, the Court reaches the same problem as before. Pursuant to its rights as a judgment creditor, the Trust obtained a writ of execution directing the United States Marshal to offer 0 Office Park Drive for public sale; the Trust was the winning bidder at $5,000. (Dkt. 103-67.) Mike does not seek any reduction for this property, and the Trust is silent on whether the judgment should be reduced. However, the property is a thing of value the Trust recouped based on its position as a judgment creditor, presumably to pay down the judgment. Once again, the Court believes it is likely that the value of the property should be credited against the judgment in some way, but the parties have left the Court in the dark about how to do so. As such, the motion is denied without prejudice as to the 0 Office Park Drive property. The parties are ordered to meet and confer in person or by videoconference within seven days of this order. At that meeting, they are ordered to discuss whether they can agree on the following issues: 1) whether the transfer of 0 Office Park Drive may be used to reduce the judgment; 2) if so, what is the amount the judgment should be reduced; 3) if the parties cannot agree on an amount to reduce the judgment, they are ordered to discuss whether they can agree to a method of valuation (*e.g.*, fair market value at the time of the transfer, fair market value today, the amount reflected in the lien granted to the Trust, etc.) and who should assess the value (*e.g.*, the Court, a third-party assessor agreed on by the parties, government tax assessor records). The parties must file a joint status report following that meeting that does not exceed five pages within 14 days of this order. The Court will determine next steps after reviewing that filing.

### CONCLUSION

Defendants' Motion Pursuant to Rule 60(b)(5) and for Entry of an Injunction [95] is granted in part and denied in part.

**ENTERED: December 8, 2022**

_____

Hon. Susan E. Cox,
United States Magistrate Judge

18